UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CONNIE OVERSTREET,                                    Case No. 2:23-cv-98

        Plaintiff,                                   Hon. Maarten Vermaat
                                                      U.S. Magistrate Judge

   v.

ONTONAGAN, COUNTY OF, et al.,

        Defendants.

_____/

**OPINION**

### I.  Introduction

This Opinion addresses Defendants' motion for summary judgment, Plaintiff's response in opposition, and Defendants' reply to Plaintiff's response.   (ECF Nos. 55, 59, 62.)

Plaintiff Connie Overstreet, personal representative of the estate of her father, Paul Richard Bliven, brought suit pursuant to 42 U.S.C. § 1983 alleging Defendants violated rights secured under the Fourth, Eighth, and Fourteenth Amendments, as well as various state laws.   (ECF No. 1.)

Plaintiff sued the following six Defendants in their individual and official capacities:

- Ontonagon County,

- Sheriff Dale Rantala,

- Jail Administrator Jason Devere Clinesmith,

1

- Corrections Officer Girard Waldrop,

- Corrections Officer Doug William Roberts, and

- Deputy John Jason Hasenberg.

(*Id.*, PageID.4−6.)

On April 11, 2025, the Defendants filed a motion for summary judgment. (ECF No. 55.)

On May 30, 2025, Plaintiff moved for partial summary judgment as part of her response in opposition to the Defendants' motion for summary judgment. (ECF No. 59.)

In the opinion of the undersigned, there are no genuine disputes of material fact as to Plaintiff's Fourth, Eighth, or Fourteenth Amendment claims.  Thus, the undersigned hereby **grants** the Defendants' motion for summary judgment and shall dismiss the case.

## II.  Factual Allegations

The Plaintiff alleges that on May 22, 2021, the decedent, Paul Richard Bliven, was booked by the Ontonagon County Sheriff's Office.  (ECF No. 1, PageID.7.) Girard Waldrop assessed Bliven at intake.  (*Id.*, PageID.6.)  During intake, Waldrop discovered that Bliven was either intoxicated by an unknown substance or suffering from an apparent and obvious mental condition.  (*Id.*)  Bliven told Waldrop that he needed to be checked for radiation from his microwave.  (*Id.*, PageID.7.)  Bliven said that he felt hopeless, was seeing a mental health

professional, and had previously been hospitalized, but was not taking his prescribed medication.  (*Id.*)

Despite his condition, Bliven was not placed in the facility's detox cell following his assessment.  (*Id.*)  The door to the detox cell was inoperable.  (*Id.*, PageID.8.)  The metal door jam was swelling and resulted in the door being unable to close properly.  (*Id.*)

Instead, Waldrop placed Bliven in the facility's "capias" [1] cell to await arraignment.  (*Id.*, PageID.7–8.)  The capias cell contained a TV, a fan, cords, a window, and two live feed security cameras.  (*Id.*, PageID.7–8.)  Bliven had to be placed in the capias cell because, at the time, new inmates were housed separately from the general population until they tested negative for COVID-19 or showed no signs of the virus for fourteen days.  (*Id.*, PageID.7.)  Bliven was not tested for COVID-19 during his intake assessment.  (*Id.*)

At an unspecified time following intake, Bliven spoke with his attorney over the phone.  (*Id.*)  According to Plaintiff, Bliven told his attorney he would "rather

---

[1]    The Plaintiff refers to the cell where Bliven was housed the "capias" cell, while the Defendants style it the "capious" cell.  (ECF No. 1, PageID.7; ECF No. 55, PageID.177.)  Historically, writs that required an officer to take a named defendant into custody were referred to as "capias writs."  CAPIAS, BLACK'S LAW DICTIONARY (12th ed. 2024).  A capias writ is functionally analogous to a bench warrant.  *See Hall v. Tate*, No. 2:22-CV-78, 2023 WL 9597307 (E.D. Tenn. Sept. 8, 2023) (utilizing "capias" and "bench warrant" interchangeably to refer to the instrument requiring Plaintiff's arrest).  A capias cell, then, is typically the cell used to house individuals arrested on a capias warrant.   Here, the Defendants state that although they do not know why the cell is referred to as a "capious" cell, it was typically used to house female inmates.  (ECF No. 55-6, PageID.244–43.)  The undersigned shall thus refer to the cell as the "capias cell."

just lay down in his cell and die" and that "God had abandoned him."    (*Id.*)    Bliven said, "I'm not getting out anyways, so, I'll die in here."    (*Id.*)    Plaintiff alleges that Defendants heard and monitored the call, but did nothing.    (*Id.*, PageID.8.)

Four days later, on May 26, 2022, Jason Clinesmith started work to fix the inoperable detox cell door at about 2:00 p.m.    (*Id.*)    Rather than performing his duties as the desk officer, Doug Roberts assisted Clinesmith with his work on the detox cell door.    (*Id.*)    Plaintiff alleges that neither Clinesmith nor Roberts inspected the capias cell or the live feed cameras from the cell while they worked. (*Id.*, PageID.8–9.)

About half an hour later, at 2:30 pm, Plaintiff alleges that John Hasenberg arrived at the jail for his shift.    (*Id.*, PageID.8.)    Upon arrival, Hasenberg did not conduct any cell inspections.    (*Id.*)    Hasenberg did look inside the detox cell because he heard a grinding noise.    (*Id.*)    Hasenberg left the detox cell and entered the office to check his flashlight battery at 2:45 p.m.    (*Id.*)    While inside the office, Hasenberg checked the security camera live feed from the capias cell and discovered that Bliven was dead.    (*Id.*)

Plaintiff states that Ontonagon County Jail has "no policy regarding monitoring of inmates through the camera feeds."    (*Id.*)

### III.  Summary Judgment and Qualified Immunity Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law.    Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of*

*Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005).    The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251−52 (1986)).    The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion.    *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"    *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'"    *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The analysis entails a two-step inquiry.    *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).    First, the court must "determine if the facts

5

alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (1982)). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). A court may address these steps in any order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if either step of the analysis is not satisfied. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first step of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The court considers the state of the law at the second step. As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 78 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). As explained by the Supreme Court:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,'" *al-Kidd*, *supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.

6

*See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id*., at 664, 132 S.Ct. 2088 (internal quotation marks omitted).

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff, supra*, at 2023 (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson, supra*, at 641, 107 S.Ct. 3034. In the context of a warrantless arrest, the rule must obviously resolve "whether 'the circumstances with which [the particular officer] was confronted ... constitute[d] probable cause.'" *Mullenix, supra*, at 309 (quoting *Anderson, supra*, at 640–641, 107 S.Ct. 3034; some alterations in original).

*D.C. v. Wesby*, 583 U.S. 48, 63−64 (2018).

In the qualified immunity context, if the facts alleged and evidence produced, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that the officer violated a clearly established constitutional right, dismissal by summary judgment is inappropriate.   *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020) (citing *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009)).

This Opinion will address the Plaintiff's deliberate indifference claim, the arguments advanced by the Defendants, as well as Plaintiff's counter arguments.

## IV.  Analysis

### A. Fourth Amendment

In her complaint, Overstreet states that Defendants violated Bliven's Fourth Amendment rights by ignoring Bliven's mental state, placing him in a cell with potentially dangerous items, and failing to properly supervise him.  (ECF No. 1, PageID.15.)    Plaintiff does not cite any authority specifically supporting her proposition that Defendants' actions violated Bliven's Fourth Amendment privacy rights.  (*Id.*)  Defendants do not address Plaintiff's Fourth Amendment claim in their motion for summary judgment; Plaintiff does not further brief the argument in her response in opposition; and Defendants do not address the claim in their reply. (ECF No. 55, 59, 62.)

The Supreme Court has held that a pretrial detainee is guaranteed a limited privacy interest under the Fourth Amendment.  *Bell v. Wolfish*, 441 U.S. 520, 558 (1979).  When a pretrial detainee alleges a violation of that limited privacy interest, a court must consider whether the violation was reasonable, which involves the consideration of the following factors: "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."  *Id.* at 559.

Plaintiff's Fourth Amendment claim is more appropriately characterized as a deliberate indifference claim.  The parties have briefed the issues as such.  Thus, the undersigned shall analyze the allegations utilizing the deliberate indifference framework outlined below.

8

### B. Deliberate Indifference

Overstreet alleges that the Defendants were deliberately indifferent to Bliven's medical needs in violation of the Eighth and Fourteenth Amendments when they failed to heed the seriousness of Bliven's mental health condition, placed him in an inappropriate cell, and failed to monitor him appropriately. (ECF No. 1, PageID.13−15.)

The Defendants argue in their motion for summary judgment that Overstreet cannot establish a deliberate indifference claim against them. (ECF No. 55, PageID.180−85.) The Defendants assert that because the events here transpired before the Sixth Circuit issued its opinion in *Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585 (6th Cir. 2021), the Court should not apply the Fourteenth Amendment standard adopted there and instead apply the Eighth Amendment *Farmer* standard. (*Id.* (citing *Farmer v. Brennan*, 511 U.S. 825 (1994).) Defendants state that Overstreet cannot establish either the objective or the subjective prong under the *Farmer* standard. (*Id.*)

In her response in opposition, Plaintiff asserts that the Fourteenth Amendment standard elucidated in *Brawner* is the controlling authority in the case. (ECF No. 59, PageID.426.) Plaintiff asserts that the Defendants' actions were objectively unreasonable in light of the circumstances, thus establishing deliberate indifference under the Fourteenth Amendment *Brawner* standard. (*Id.*, PageID.426−27.)

Qualified immunity shields public officials from the time and expense of a trial

unless their actions infringed "clearly established" rules that a "reasonable person" would have understood. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (quoting *White*, 580 U.S. at 78–79). This immunity seeks to give officials "fair notice" about when their actions will subject them to liability. *Id.*; *see also Kisela v. Hughes*, 584 U.S. 100 (2018) (per curiam). Officers will obviously lack notice of future rules that a court has yet to adopt. Courts evaluating a qualified-immunity defense may consider only the legal rules existing when the challenged conduct occurred, not legal rules adopted by later caselaw. *Lawler as next friend of Lawler v. Hardeman Cnty., Tennessee*, 93 F.4th 919 (6th Cir. 2024) (collecting cases).

Thus, it is necessary to identify the rules that governed in May 2021, when Bliven took his life. Pretrial detainees like Bliven have a Fourteenth Amendment right not to be "deprive[d]" of their "life" "without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause offers protections to pretrial detainees that at least match those afforded convicted prisoners under the Eighth Amendment. *County of Sacramento v. Lewis*, 523 U.S. 833, 849–50 (1998).

This case implicates the legal rules that apply to claims that jail staff violated the Due Process Clause by failing to protect pretrial detainees from harm. These types of claims can arise in a variety of circumstances, including when jail staff fail to thwart a detainee's suicide. *Lawler*, 93 F.4th at 926 (citing *Downard for Est. of Downard v. Martin*, 968 F.3d 594, 598–99 (6th Cir. 2020)).

Historically, the Sixth Circuit held that Eighth Amendment rules for failure-to-protect claims by prisoners extended to similar claims by pretrial detainees

10

brought under the Due Process Clause.    *Id.* (citing *Richmond v. Huq*, 885 F.3d 928,

937 (6th Cir. 2018); *Richko v. Wayne County*, 819 F.3d 907, 915 (6th Cir. 2016); *Napier*

*v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001); *Barber v. City of Salem*, 953

F.2d 232, 235 (6th Cir. 1992)).    The Sixth Circuit's approach began to shift following

the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015).    *Id.*

There, the Supreme Court refused to extend the Eighth Amendment deliberate

indifference test to a pretrial detainee's excessive force claim, instead holding that

the Due Process clause required only that pretrial detainees show the force was

"objectively unreasonable."    *Kingsley*, 576 U.S. at 397.

The Sixth Circuit extended *Kingsley* to the failure-to-protect context in

September 2021.    *Brawner*, 14 F.4th at 591–97.    The Circuit then settled on a test

that reduced *Farmer*'s subjective element from "actual knowledge to recklessness."

*Helphenstine v. Lewis County*, 60 F.4th 305, 316 (6th Cir. 2023).    Today, officers can

face liability even if they did not actually know of a risk of harm to a pretrial detainee.

*Lawler*, 93 F.4th at 927.    Pretrial detainees must prove that the officers recklessly

disregarded a risk so obvious that they either knew or should have known of it.

*Helphenstine*, 60 F.4th at 317.

Notably, the shift in the Sixth Circuit's cases departing from the *Farmer*

standard    were    delivered    between    September    2021    and    2023.

*Lawler*, 93 F.4th at 927.    Because the shift in caselaw <u>postdates</u> Bliven's suicide, it

does not clearly establish anything at the time the officers acted.    *Id.* (citing *Kenjoh*

*Outdoor*, 23 F.4th at 694).    The clearly established standard at the time the claims

11

arose in 2021 was that of *Farmer*.   *Id*.   *Farmer* requires the officers to have "consciously" (not recklessly) disregarded that risk to Bliven.   *Id*. at 928 (citing *Farmer*, 511 U.S. at 839 (emphasis added)).   Officers must have "draw[n] the inference" that the risk existed.   *Id*. (quoting *Farmer*, 511 U.S. at 837).

Given the date of the conduct at issue here, May 26, 2022, the undersigned must apply *Farmer's* standards.   *Id*.

*Farmer*'s objective element generally requires inmates to show that they faced a "substantial risk of serious harm" before they suffered an injury.   511 U.S. at 834. When this substantial risk of serious harm arises from a physical or mental impairment, the Court has added that "serious medical needs" can satisfy this objective element.   *Estelle*, 429 U.S. at 104; *see Phillips v. Tangilag*, 14 F.4th 524, 534 (6th Cir. 2021).   The Sixth Circuit has recognized that suicide constitutes a serious harm.   *Lawler*, 93 F.4th at 928.   Inmates do not have a guaranteed Eighth Amendment right "to be screened correctly for suicidal tendencies," however, "prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner." *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 482 (6th Cir. 2020) (citing *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001); *Perez v. Oakland County*, 466 F.3d 416, 423 (6th Cir. 2006)).

The Circuit has recognized that Plaintiffs can show there was a substantial risk of suicide by showing that the inmates suffered from "psychological needs" that led them to have "suicidal tendencies."   *Lawler*, 93 F.4th at 928 (collecting cases). Pre-suicide statements or behavior must reveal "an objectively 'strong likelihood' that

12

the pretrial detainee would try to commit suicide." *Id.* (quoting *Perez*, 466 F.3d at 428–29). Whether an individual has recently attempted suicide or threatened to harm themselves may demonstrate the necessary strong likelihood. *Id.* (citing *Troutman*, 979 F.3d at 484; *Davis v. Fentress Cnty. Tennessee*, 6 F. App'x 243, 247, 249 (6th Cir. 2001). However, despondency after an arrest, even if coupled with other stressors like drug withdrawal, does not itself lead to a "strong likelihood" of suicide, at least if the inmate expressly denies feeling suicidal. *Troutman*, 979 F.3d at 483 (citing *Nallani v. Wayne County*, 665 F. App'x 498, 507−08 (6th Cir. 2016) (holding that inmate did not present a "strong likelihood" of suicide because he denied feeling suicidal, despite indicating previous suicidal thoughts and a history of self-harm)).

*Farmer's* subjective element requires a showing that the officers knew of the facts creating the substantial risk of suicide, actually believed there was a substantial risk, and failed to respond to that risk in a reasonable manner. *Lawler*, 93 F.4th at 928. This framework creates a "demanding" test when an estate of a deceased inmate challenges an officer's failure to prevent a suicide. *Galloway*, 518 F. App'x at 335. An estate must prove more than that an officer knew of a "*possibility*" or "*even a likelihood*" of the suicide. *Downard*, 968 F.3d at 601 (quoting *Galloway*, 518 F. App'x at 336) (emphasis in original). Rather, the officer must have believed that a "strong likelihood" existed that the inmate would commit suicide. *Barber*, 953 F.2d at 240; *see Downard*, 968 F.3d at 601. Plaintiffs may demonstrate an officer's state of mind using direct or circumstantial evidence. *Lawler*, 93 F.4th at 929.

13

Courts have typically required plaintiffs utilizing circumstantial evidence to show that an officer knew of an inmate's "suicide watch" classification or of other equally revealing facts. *Downard*, 968 F.3d at 601. Courts have found sufficient circumstantial evidence where an inmate told officers that he was suicidal and needed to go to the hospital when officers knew that he had recently been released from a mental-health facility. *See Bonner-Turner*, 627 F. App'x 400, 408–10 (6th Cir. 2015). Similarly, evidence was sufficient where an officer knew of the inmate's past suicide attempts, knew that the inmate had recently been placed on suicide watch, and knew that the inmate was complaining of pain and crying out to go to the hospital. *See Schultz v. Sillman*, 148 F. App'x 396, 401–03 (6th Cir. 2005).

### 1. Objective Prong

Plaintiff Overstreet asserts that Bliven faced an objective risk of harm by suicide because of (1) Bliven's mental health history, (2) Bliven's mental condition upon booking, and (3) Bliven's physical condition upon booking. (ECF No. 1; ECF No. 59.) Defendants argue there was not an objective risk of harm by suicide to Bliven. (ECF No. 55.)

Plaintiff states that before his death, Bliven suffered from a mental illness for which he had previously been hospitalized. (ECF No. 59, PageID.416; ECF No. 59-2, PageID.450 (January 8, 2021 Police Report).) On January 8, 2021, Bliven called the Ontonagon Sheriff's Office to report that he was in his basement with a shotgun because people were breaking into his home. (ECF No. 59-2, PageID.450.) Upon their arrival, Bliven told Deputies Hasenberg and Weaver that he had fired shots out

14

his window.   (*Id.*)   The Deputies determined there were no intruders and interviewed neighbors.   (*Id.*)   Neighbors reported the shooting was an ongoing problem and that the state police had been called repeatedly.   (*Id.*)   Bliven was taken into protective custody.   (*Id.*)   Deputies determined that Bliven's judgment was so impaired by mental illness that he was unable to understand his need for treatment and that he posed a substantial risk of harm to others in the near future. (*Id.*, PageID.453.)   Bliven was committed and transported to Marquette General Hospital.   (*Id.*, PageID.450.)

On January 9, 2021, Bliven was assessed by Nurse Wilson.   (ECF No. 62-2.) At that time, Bliven presented as "[a]gitated," "[i]rritable," and "[d]isorganized." (*Id.*, PageID.625.)   Despite this, Bliven stated that he had no suicidal ideation, did not want to hurt himself, and had never tried to hurt himself.   (*Id.*, PageID.622.) Bliven stated that he had not wished he was "dead or [that he] could go to sleep and not wake up."   (*Id.*, PageID.623.)   Bliven stated in the past month he had not thought of killing himself or doing anything to end his life.   (*Id.*)   When assessed later in the evening, Bliven repeated he had not thought of killing himself or ending his life.   (*Id.*, PageID.633.)   Bliven reiterated that he was not suicidal each day from January 10 to January 25, 2021.   (*Id.*, PageID.636, 643, 648, 652, 660, 667, 674, 682, 689, 693, 701, 707, 713, 719, 724, 730.)   Bliven was diagnosed with an "Unspecified Psychotic Disorder" and was discharged.   (*Id.*, PageID.738, 750.)

Roughly four months later on May 22, 2021, Michigan State Police were dispatched on a report that a home had been shot at "several times."   (ECF No. 55-

2, PageID.202 (MSP Report).)   Troopers determined the shots were fired from Bliven's residence.   (*Id.*)   Negaunee Regional Dispatch contacted Bliven, Bliven stepped outside his home, and was detained.   (*Id.*)   Troopers noted Bliven was agitated and anxious.   (*Id.*, PageID.203.)   Bliven told troopers he was shooting "lasers" coming from his neighbor's window, that his neighbors were part of a gang, and that his neighbors used "microwave frequencies to fry him from the inside."   (*Id.*) Bliven was transferred to the Ontonagon County Jail.   (*Id.*, PageID.202.)   Bliven was charged with reckless discharge of a firearm, felonious/aggravated assault, and possession of methamphetamine.   (*Id.*)

Ontonagon County is home to 5,816 people and is the third least populous county in Michigan.[2]   The Ontonagon County Jail is staffed by the Ontonagon Sheriff's Department which, at the time relevant to the complaint, was included a sheriff, five deputies, and five corrections officers.   (ECF No. 55-7, PageID.287.) The Department's small size requires corrections officers to do a multitude of tasks rather than specializing in any one task, thus, a corrections officer's duties might include checking on inmates, monitoring cameras, and maintenance.   (*Id.*, PageID.288.)

Corrections Officer Waldrop booked into the Ontonagon County Jail at 3:22 pm on May 22, 2021.   (ECF No. 55-3, PageID.205 (Bliven Medical Assessment Form).) As part of the booking process, Waldrop conducted a medical assessment.   (*Id.*,

---

[2]     U.S. CENSUS BUREAU, *Total Population in Ontonagon County, Michigan 2020*, https://data.census.gov/all?q=Ontonagon+County,+Michigan (last visited Aug. 15, 2025).

PageID.210−16.)   During this assessment, Waldrop said that Bliven was "not happy about being arrested."   (ECF No. 55-6, PageID.252 (Waldrop Deposition).)

Waldrop asked Bliven questions about his mental health.   (ECF No. 55-3, PageID.214.)   When asked "[a]re you currently or have you ever had thought of killing yourself or attempted to harm yourself," Bliven replied, "No."   (*Id.*)   Bliven told Waldrop he was angry that he had been arrested.   (ECF No. 55-6, PageID.251−52.)   Bliven said he had had feelings of uselessness or hopelessness after his "old lady" died two years ago, but when Waldrop asked for clarification Bliven said had not had those feelings recently.   (*Id.*; ECF No. 55-3, PageID.214.) Waldrop asked Bliven if there were "any other mental health problems or anything that [the jail] should know about," Bliven said no.   (ECF No. 55-6, PageID.252.) Bliven said that he was not thinking of and did not have plans to harm himself or others in the jail.   (ECF No. 55-3, PageID.214.)   Bliven admitted that he had been treated by a mental health professional at Marquette General Hospital and that he had been prescribed anxiety pills he no longer took.   (*Id.*)

Bliven told Waldrop that he should be checked for radiation from his microwave.   (ECF No. 55-6, PageID.253.)   The request seemed "unreasonable" to Waldrop.   (*Id.*)   However, Sheriff Rantala notes that "a lot of people" booked in the jail complain about microwave radiation and that it is not "a red flag for suicide." (ECF No. 55-7, PageID.290.)

At intake, Waldrop also noted that Bliven displayed slurred speech.   (ECF No. 55-3, PageID.211.)   Waldrop observed that Bliven had slurred speech during the

17

medical assessment and noted that it appeared Bliven was under the influence of alcohol or drugs.  (*Id.*, PageID.211−13.)   Department policy states that if it is determined that a person being booked is "exceptionally intoxicated," they must be transported to a hospital rather than being lodged at the jail.  (ECF No. 55-14, PageID.385.)   Similarly, individuals being booked who display signs of "serious injury or illness, physical or mental, will not be booked."  (*Id.*)   Waldrop states that in his six-and-a-half years with the Department, he has only declined to book one person for the "severe" intoxication described by Department policy.  (ECF No. 55-6, PageID.256.)   In that instance, the individual was so intoxicated they were sent to the emergency room.  (*Id.*)   In contrast, Bliven did not display signs of sweating or tremors at intake and did not admit to having any drug or alcohol addictions that would cause withdrawals.  (ECF No. 55-3, PageID.212−13.)

Based on his responses to the medical assessment, the jail's risk assessment formula determined Bliven's risk level was within the minimum or medium risk range.  (*Compare* ECF No. 55-6, PageID.255 (stating Bliven was a minimum risk); ECF No. 55-7, PageID.291 (stating Bliven was a medium risk).)   Thus, Waldrop assigned Bliven to the capias cell after the booking process was complete.   (ECF No. 55-3, PageID.209.)   Bliven remained in the capias cell throughout his time in the Ontonagon County Jail.

On May 26, 2021 at 8:38 am, Bliven was arraigned at the 98th District Court.  (ECF No. 55-12, PageID.364.)   The prosecuting attorney informed Bliven that two additional charges for felonious assault and discharge of a firearm in a dwelling or

18

carrying a dangerous weapon would be coming.   (ECF No. 55-13, PageID.366−68.) The judge appointed Bliven an attorney at the hearing.   (*Id.*)   Bliven, though seemingly confused, made no statements regarding his mental health during the hearing.   (*Id.*)

In her complaint, Plaintiff states that on an unspecified date, Bliven had a phone conversation with his attorney.   (ECF No. 1, PageID.7.)   During the conversation, Bliven stated that he wanted to "lay down in his cell and die, that God had abandoned him" and that he was "not getting out anyways" so he would "die in [the jail]."   (*Id.*)   Plaintiff states that the conversation was monitored and recorded by the jail.   (*Id.*)

To satisfy the objective prong, the Plaintiff must show there was a substantial risk of harm before the injury occurred.   *Lawler*, 93 F.4th at 928.   A pretrial detainee's recent suicide attempt or threats of self-harm are typically sufficient to demonstrate a substantial risk of harm.   *Id.*   The bar to establish a strong likelihood of suicide is particularly high when a pretrial detainee has denied feeling suicidal.   *Troutman*, 979 F.3d 472 (6th Cir. 2020).   Plaintiffs may not rely on "generic risk factors" to demonstrate there was a substantial risk of harm.   *Berrier v. Lake Cnty., Ohio*, No. 1:22-CV-813, 2024 WL 4591816, at *12 (N.D. Ohio Oct. 28, 2024) (citing *Downard*, 968 F.3d at 601).   Drug withdrawal known by staff at the time of booking is insufficient to establish a strong likelihood of suicide.   *Troutman*, 979 F.3d at 483 (citing *Baker-Schneider v. Napoleon*, 769 F. App'x 189, 193−94 (6th Cir. 2019) (stating despondency and drug withdraw at booking insufficient to

create strong likelihood of suicide).   Similarly, irritability and anxiety exhibited by a detainee may be insufficient.   *Craddock v. Cnty. of Macomb*, 718 F. Supp. 3d 683, 700 (E.D. Mich. 2024).   Even prior history of hospitalization, where suicidal ideation is denied and prior suicide attempts are denied, is insufficient to create the necessarily strong risk.   *Id.* (stating the decedent's two prior hospitalizations were insufficient to create a strong likelihood of suicide because the decedent only told jailors about the latter episode and denied previous suicide attempt during intake).

In the opinion of the undersigned, there remains no genuine dispute of material fact as to the objective prong of the Plaintiff's deliberate indifference claim. The evidence in the record does not show that there was a substantial risk of harm before the injury occurred.   The record before the court shows that Bliven was arrested on charges related to methamphetamine and exhibited slurred speech when he was initially assessed by Waldrop.   Although he exhibited signs of slurred speech, Bliven did not appear to be severely intoxicated to the level that would suggest he should not be booked.   Bliven communicated clearly with Waldrop, did not have shakes or tremors, and reported that he would not experience any type of withdrawal symptoms while he was housed in the jail.   Bliven made a strange comment about microwave radiation, but that being a common comment in the jail population, it was not a sign of possible suicidal ideation.

Indeed, when directly asked, Bliven told Waldrop that while he was angry he had been arrested, he did not plan to harm himself or others while he was in the jail. (ECF No. 55-6, PageID.252; ECF No. 55-3, PageID.214.)   Bliven stated that he was

20

not suicidal.    (ECF No. 55-3, PageID.214.)    Bliven did tell Waldrop that he experienced feelings of hopelessness, but clarified that these feelings occurred following the loss of his life partner *two years* previously.   (*Id.*; ECF No. 55-6, PageID.251−52.)   Bliven informed Waldrop that he had previously been hospitalized for his mental health, but explained that he had been treated for anxiety.    (ECF No. 55-3, PageID.214.)    Records show that while he was being treated at Marquette, Bliven repeatedly stated he did not plan to commit suicide or to harm himself. (ECF No. 62-2.)

The undersigned recognizes that at the summary judgment stage, the court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the non-moving party.    In her complaint, Plaintiff states that Bliven told his attorney over the phone that he wanted to die and that the Defendants heard and monitored the call.    This allegation is the *lynchpin* of the case. Below are screenshots of the allegations:

> 21.  Bliven reported to his attorney on the recorded jail phone line that he'd rather just lay down in his cell and die, that God had abandoned him and that "I'm not getting out anyways, so, I'll die in here."
>
> 22.  Although Defendants monitored and heard the call, nothing was done to prevent the suicide.

(ECF No. 1, PageID.8−9.)

The facts alleged in the complaint regarding Bliven's statement to his attorney would likely be sufficient to survive a Rule 12(b)(6) motion, where Plaintiff's

allegations must be taken as true.   However, the facts alleged are insufficient to meet the Rule 56 standard.   Although Plaintiff has made an allegation that Bliven told his attorney he was suicidal and that the Defendants heard that allegation, Plaintiff has provided no Rule 56 evidence supporting her statement.   Plaintiff has produced no call-log demonstrating that a call even took place between Bliven and his attorney between May 21 and May 26, 2021.   Plaintiff has not produced a recording of the phone call.   Plaintiff has provided no exhibits relating to jail policy on monitoring of attorney-client phone calls.   Plaintiff has provided no affidavit or deposition from Bliven's attorney concerning the phone call or the jail's phone call policies.   Plaintiff has not deposed any Defendant on the issue of the phone call, its alleged contents, or the question of who may have been present to monitor the phone call.   Plaintiff's statement that the phone call occurred and that Bliven told his attorney he was suicidal is conclusory and thus does not meet the standard required by Rule 56.

Although the undersigned concludes that Plaintiff did not demonstrate there was an objective risk of serious harm to Bliven, the undersigned shall evaluate the subjective prong as to each Defendant below.

## 2.  Defendant Waldrop

In the opinion of the undersigned, even assuming Plaintiff had demonstrated there was an objective risk of serious harm to Bliven, no reasonable jury could find that Waldrop knew there was a strong likelihood that Bliven would commit suicide,

believed there was a strong likelihood, or acted unreasonably in the face of a strong likelihood.

Plaintiff alleges Waldrop was deliberately indifferent because he (1) was aware of Bliven's mental state and possible intoxication during booking, (2) housed Bliven in the capias cell, rather than the detox cell, which contained a TV, an industrial sized fan, and a window, and (3) did not provide an additional assessment by a medical professional.   (ECF No. 1, PageID.6–7; ECF No. 59, PageID.420.)

On May 21, 2021, Waldrop worked as a corrections officer in the Ontonagon County Jail doing intake and booking of inmates.   (ECF No. 55-6, PageID.241.) Waldrop says his primary job is to take care of the needs of the inmate at the time of booking.   (*Id.*, PageID.246.)   As part of intake, Waldrop took basic information from incoming detainees including contact information, fingerprints, and past criminal history.[3]   (*Id.*, PageID.241.)   Waldrop also conducted limited medical assessments on medical, dental, and mental health.   (*Id.*, PageID.421–42; ECF No. 55-14, PageID.379 (Ontonagon County Sheriff's Office Department Policy and Procedures).) Information collected in the initial intake that "need[ed] to be referred" would be reported to the appropriate medical professional.   (ECF No. 55-14, PageID.380.)   It was the duty of supervisors to ensure that inmates were evaluated.   (ECF No. 55-6, PageID.253.)   However, assessments by medical personnel were only required to occur within 14 days of booking.   (ECF No. 55-14, PageID.380.)

---

[3]      Waldrop says that although it is possible he was present at the time of Bliven's January 2021 arrest, he does not remember encountering Bliven at that time.   (*Id.*, PageID.246.)

More immediately, intake information was used to determine the appropriate security classification for the inmate.   (*Id.*, PageID.374−76; ECF No. 55-6, PageID.242.)   At intake, Bliven denied present feelings of hopelessness, past suicide attempts, and present suicidal ideations, but exhibited signs of slurred speech. (ECF No. 55-3, PageID.211−14.)   Generally, inmates were assigned housing according to their classification level.   (ECF No. 55-14, PageID.376.)   Waldrop explains that he does not assign an inmate's classification on his own.   (ECF No. 55-6, PageID.255.)   Rather, Waldrop inputs data like past criminal history, behavior, and seriousness of arresting offense into the jail's computer program, which then designates the inmate's risk level.   (*Id.*, PageID.241−42.)   Waldrop states an inmate's classification is ultimately not his decision because the computer program makes the determination itself.   (*Id.*, PageID.246.)

Based on the answers provided, Bliven was designated a minimum or medium risk.   (*See* ECF No. 55-6, PageID.255; ECF No. 55-7, PageID.291 (providing conflicting accounts of whether Bliven was minimum or medium risk).)   Waldrop states that based on Bliven's responses he did not believe Bliven would be a harm to himself.   (ECF No. 55-6, PageID.260.)

However, department policy required that inmates who were determined at intake to be "intoxicated and/or suicidal [would] be housed in the detox cell where they [could] be constantly observed."   (ECF No. 55-14, PageID.385.)   Although Bliven was not deemed a suicide risk, he displayed possible signs of intoxication.

24

(ECF No. 55-6, PageID.253−54.)    Thus, policy dictated that he be placed in the detox cell for observation of signs of withdrawal or seizures.    (*Id.*)

When Bliven was booked, the detox cell at the Ontonagon County Jail was unavailable.    (ECF No. 55-8, PageID.311−12 (Clinesmith Deposition).)    Corrections officers were unable to place inmates in the detox cell because the cell door had been inoperable for at least four prior days.    (*Id.*)    The detox cell door jamb was swelling and prevented the door from opening properly.    (ECF No. 59-6, PageID.473 (Clinesmith Statement to Michigan State Police).)

Additionally, at the time the events of this case transpired, the COVID-19 pandemic was actively ongoing.    On April 27, 2020, Michigan Governor Gretchen Whitmer issued Executive Order 2020-62 on temporary COVID-19 risk reduction protocols in county jails, requiring isolating and testing inmates entering facilities. Whitmer Exec. Order No. 020-62 (April 27, 2020).    In conformance with Executive Order 2020-62, the Ontonagon County Jail issued their own policy in March 2020, requiring that all new arrestees be tested for COVID-19 and be held in a quarantine cell for 14 days, isolated from the general jail population.    (ECF No. 55-4, PageID.219−20.)    The COVID-19 protocol remained in effect at the time Bliven was booked.    (ECF No. 55-6, PageID.250.)

During the COVID-19 pandemic, the capias cell was frequently used to isolate incoming inmates in conformance with COVID-19 isolation policy.    (*Id.*)    The capias cell at the Ontonagon County Jail is typically reserved for female inmates, thus, it was necessary to use an override in the computer system to place a male inmate in

the cell.. (*Id.*, PageID.249.)    Because the detox cell was inoperable and thus unavailable and Bliven needed to be isolated from other inmates, Waldrop overrode the "business rule" to place Bliven in the capias cell.    (ECF No. 55-3, PageID.209; ECF No. 55-6, PageID.254.)    Staff may override inmate classifications in situations where "loss of security" or concerns about staff safety are present.    (ECF No. 55-14, PageID.376.)    Waldrop did not need permission to override the business rule because it was considered routine COVID-19 protocol to use the capias cell for COVID-19 isolation when the detox cell was unavailable.    (ECF No. 55-6, PageID.254.)

Both the detox cell and the capias cell are monitored by live video feed.    (ECF No. 55-8, PageID.312; ECF No. 55-9, PageID.341; ECF No. 55-6, PageID.246.)    Both cells are also included in physical hourly rounds.    (ECF No. 55-6, PageID.246; ECF No. 55-9, PageID.341.)    Both cells are located in close proximity to the monitoring station at the jail.    (ECF No. 55-7, PageID.291.)    The detox cell is located directly behind the dispatch station and the capias cell is located 20 to 25 feet away.    (ECF No. 59-6, PageID.473; ECF No. 55-7, PageID.292.)    Both cells are considered the easiest to walk to, to see, and to hear.    (ECF No. 55-6, PageID.246.)    The capias cell differs from the detox cell in that it contains a shower, a fan, a TV, and a window. (ECF No. 55-6, PageID.244.)    The detox cell contains only a mattress, blanket, and pillow.    (*Id.*, PageID.258.)

Waldrop states that at the time of booking, Bliven "didn't give us any cause to think that he would harm himself" and that Bliven "wasn't showing signs of suicide." (ECF No. 55-6, PageID.262.)    Waldrop says that the detox cell was unavailable to

26

Bliven at intake.   (*Id.*, PageID.259.)   The capias cell was considered the next best option because of COVID-19 protocols, the close proximity to the monitoring desk, and the live video feed in the cell.   Waldrop says that based on his assessment of Bliven at the time of intake and his formulated classification level, the fan cords in the capias cell were not dangerous and did not pose a risk of harm to Bliven.   (*Id.*, PageID.262)   Waldrop says that during his interaction with Bliven, he "didn't see signs or talking or mannerisms [of suicide]" from Bliven.   (*Id.*, PageID.263.)

In the opinion of the undersigned, no reasonable jury could conclude Waldrop knew there was a strong likelihood Bliven would commit suicide, that he believed there was a strong likelihood, or that he acted unreasonably by placing Bliven in the capias cell.   Evidence in the record shows that Bliven repeatedly told Waldrop he was not feeling hopeless, was not considering self-harm, and was not considering suicide.   Although Bliven displayed slurred speech, he did not appear to be severely intoxicated.   Waldrop's primary duty was to input information into the computer system, so the Department's software could determine Bliven's risk level.   Bliven's responses placed him in either the minimum of medium risk categories.   Waldrop relied on this computer classification to place Bliven in a cell.   Policy dictated that because Bliven showed signs of intoxication upon booking, he should be placed in the detox cell.   The detox cell door was broken and thus not secure.   Waldrop did not believe that Bliven was a risk to himself and thus placed him in the capias cell, which would have been appropriate per his classification level.   Waldrop acted reasonably in placing Bliven in the capias room, despite the presence of the fan and TV, because

he relied on the computer risk level classification and did not know or believe Bliven would harm himself.

### 3. Defendant Clinesmith

Based on the undisputed factual evidence, no reasonable jury could find that Clinesmith knew there was a strong likelihood that Bliven would commit suicide, believed there was a strong likelihood, or acted unreasonably.

During the time relevant to this complaint, Clinesmith served as the administrator for the Ontonagon County Jail. (ECF No. 55-8, PageID.309.) Clinesmith was tasked with overseeing jail operations, which included supervising corrections officers, helping draft jail policies, and basic maintenance of the facility. (*Id.*, PageID.309–10.) Because the Department had a small staff, officers were expected "to do a multitude of things" on their shifts. (ECF No. 55-7, PageID.288.)

When Bliven was booked on May 22, 2021, Clinesmith was not working. (ECF No. 55-7, PageID.312.) Clinesmith also did not work on May 23, 2021. (*Id.*) As jail administrator, Clinesmith is notified when new inmates are booked. (*Id.*) Clinesmith is also notified when inmates are not suitable for the general population. (*Id.*) Clinesmith was not notified that Bliven was not suitable for the general population. (*Id.*) Waldrop notified Clinesmith that Bliven was a medium risk inmate and that he would be placed in the capias cell as a COVID-19 holding cell. (*Id.*; *Id.*, PageID.318.) Clinesmith was not aware that at the time of booking Bliven appeared to be intoxicated, but states that because Bliven "displayed no signs of any

28

kind of suicidal ideation […] he should have gone to the capious [sic] cell as detox was not available."  (*Id.*, PageID.318.)

Between May 22 and May 26, 2021, the detox cell door was inoperable and was thus not in use.  (*Id.*, PageID.311.)   Clinesmith asked Sheriff Rantala to contact an individual at the county road commission about fixing the door.  (*Id.*)   Clinesmith was not informed if the road commission was coming to fix the door.  (*Id.*, PageID.314.)

On May 26, 2021, rather than waiting for the member of the road commission, Clinesmith decided he would start the repair on the detox cell door.  (*Id.*, PageID.313.)   At 2:09 pm, Clinesmith states that he did a cell check.  (*Id.*)   At that time, Clinesmith spoke with Bliven and informed him that there would be some noise at the detox cell door.  (*Id.*)   Bliven told Clinesmith, "[I]t's your jail do whatever the fuck you want."  (*Id.*)   Clinesmith thanked him and walked to the detox cell door. (*Id.*)   At the time of their conversation, Bliven "didn't have any appearance, no sign of any kind of harm to himself."  (*Id.*)   Clinesmith had no further interaction with Bliven.   Clinesmith worked with Roberts to grind down a portion of the detox cell door.  (*Id.*)   The noise from the grinder was "pretty loud."  (*Id.*)   Clinesmith did not wear headphones or protective earpieces while he worked.  (*Id.*, PageID.314.)

In the opinion of the undersigned, no reasonable jury could find that Clinesmith knew Bliven was strongly likely to harm himself, believed there was a strong likelihood, or responded unreasonably in light of that knowledge or belief.   As jail administrator, Clinesmith had limited interaction with Bliven.   Clinesmith was

not working when Bliven was booked.   Clinesmith was informed that Bliven had been booked, but was told that Bliven was only a medium security classification. Clinesmith had a brief interaction with Bliven at 2:09 pm on May 26, but observed no behavior or mannerisms that would suggest a risk of suicide during that interaction.   Clinesmith did not act unreasonably by proceeding with repair work at the cell next door, a mere 20 feet away.

### 4.  Defendant Roberts

Similarly, no reasonable jury could find that Roberts knew there was a strong likelihood that Bliven would commit suicide, believed there was a strong likelihood, or acted unreasonably.

At the time relevant to the complaint, Roberts worked as a corrections officer at the Ontonagon County Jail.   (ECF No. 55-9, PageID.337 (Roberts Deposition).) As one of five corrections officers in the department, Roberts was responsible for monitoring cameras, conducting cell checks, basic maintenance, and more.   (ECF No. 55-7, PageID.287–89.)   Department policy required Roberts to conduct cell checks at least once every hour.   (ECF No. 55-14, PageID.372.)   Cell checks were to be made at irregular intervals to prevent inmates from anticipating a schedule of checks, but no more than 60 minutes were to elapse between any two checks.   (*Id.*) A check was to be conducted within the first 30 minutes of every corrections officer shift and within the last 30 minutes of every corrections officer shift.   (*Id.*)   Cell checks included checking on inmates and making sure that they were okay.   (ECF No. 55-9, PageID.337.)

30

On May 26, 2021, Roberts started his shift at 6:00 am.   (*Id.*, PageID.338.)
Roberts was assigned to work the department's desk.   (*Id.*)   Although he was
assigned to the desk, Roberts was not required to remain at the desk for every minute
of his shift.   (ECF No. 55-7, PageID.288.)   Roberts was responsible not only for
monitoring cameras, but also for receiving calls, doing cell checks, and feeding
inmates.   (ECF No. 55-9, PageID.338.)   At no time during his shift did Roberts
transport Bliven from one cell to another.   (*Id.*, PageID.340.)   Roberts was aware
that Bliven was in the capias cell and was aware of the cell's contents.   (*Id.*)
Roberts completed rounds at 12:40 pm and at 1:25 pm.   (ECF No. 55-15,
PageID.390–92 (Roberts Jail Activity Log).)   Policy required that Roberts complete
his next check on Bliven sometime before 2:25 pm.   (ECF No. 55-14.)

At 2:09 pm, Clinesmith checked-in with Bliven before starting work on the
detox cell door.   (ECF No. 55-8, PageID.313.)   Clinesmith observed no signs of
apparent distress.   (*Id.*)   Roberts helped Clinesmith grind down the detox cell door
to prevent it from sticking.   (ECF No. 55-9, PageID.338.)   Staffing at the jail was
limited, so it was standard practice for corrections officers to serve as maintenance
personnel.   (*Id.*, PageID.338–39.)   While he worked on the door, Roberts was not at
the desk and did not observe the camera monitors.   (*Id.*, PageID.340.)   However,
the Department had no policy regarding the monitoring of surveillance camera at the
time of the events relevant to the complaint.   (ECF No. 55-7, PageID.288.)   While
they worked on the door, only Clinesmith and Roberts were in the building,
Hasenberg was "out making his rounds."   (*Id.*)

31

After Clinesmith left the cell door, video footage shows that Bliven got a drink and used the restroom.    (ECF No. 55-16, PageID.403 (Michigan State Police Incident Report).)    Bliven looked out his cell door for a last time at 2:11 pm.    (*Id.*)    Bliven unplugged the fan and tied its cord on the window.    (*Id.*)    At 2:13 pm, Bliven put his head in the cord and hanged himself.    (*Id.*)    Bliven moved for the last time at 2:15 pm.    (*Id.*)

Hasenberg did not return to the jail until about 2:30 pm.    (ECF No. 55-10, PageID.351 (Hasenberg Deposition).)    Hasenberg observed Bliven on the camera footage at roughly 2:45 pm and realized something was wrong.    (ECF No. 55-16, PageID.399.)    Jail personnel entered the cell door soon afterward and administered life saving measures.    (*Id.*, PageID.403.)    Roberts did not complete another cell check until 3:40 pm.    (ECF No. 55-15, PageID.390−92.)

Courts in this district have found that where a detainee did not manifest a substantial risk that he would commit suicide, defendants did not act with deliberate indifference where they complied with 60 minute check-in times required by department policy.    *Craddock*, 718 F. Supp. 3d at 705 (citing *Plair v. Cnty. of Macomb*, No. 21-CV-12275, 2023 WL 4933932, at *17 (E.D. Mich. Aug. 2, 2023)).

For these reasons, there remains no genuine dispute of material fact as to the subjective prong of Plaintiff's deliberate indifference claim against Roberts.    Roberts had limited interaction with Bliven during his shift.    Roberts conducted hourly checks on inmates as required by policy.    There is no evidence in the record suggesting that Roberts knew or believed that Bliven should be monitored on a more

32

frequent basis.   Although he was assigned to work the desk, Roberts was not required to and did not sit constantly at the desk.   No department policy required him to maintain constant monitoring of the video surveillance feed.   Instead, Roberts conducted his check at 1:25 pm and assisted Clinesmith repair the detox cell door.   Clinesmith conducted a check at 2:09, before the hour interval for Roberts's check had elapsed and found no indicators that Bliven would commit suicide.   The earliest that Roberts was required to check on Bliven would have been 3:09 pm.   Roberts completed his rounds and acted reasonably in light of the information he had regarding Bliven's mental status.

### 5.  Defendant Hasenberg

Likewise, no reasonable jury could find that Hasenberg knew there was a strong likelihood that Bliven would commit suicide, believed there was a strong likelihood, or acted unreasonably.

At the time relevant to this complaint, Hasenberg was a deputy of the Ontonagon Sheriff's Department.   (ECF No. 59-7, PageID.476 (Hasenberg Statement to Michigan State Police[4]).)   Rather than working as a corrections officer doing rounds in the County Jail, Hasenberg's primary duty with the Department was road patrol.   (*Id.*; ECF No. 55-10, PageID.353.)

---

[4]    Hasenberg acknowledges in his deposition that he failed to sign his statement to the Michigan State Police.   (ECF No. 55-10, PageID.352.)

Hasenberg states that he interacted with Bliven during his prior arrest, but did not remember the specific date when that arrest occurred.   (ECF No. 55-10, PageID.350.)

On May 26, 2021, Hasenberg conducted a road patrol and returned to the County Jail at roughly 2:30 pm.   (*Id.*, PageID.351.)   Upon entering the jail, Hasenberg encountered Clinesmith and Roberts as they worked on the detox cell door.   (*Id.*)   Hasenberg briefly spoke with them as they finished grinding down the door, making what he believed was a "very minor" repair.   (*Id.*)

Hasenberg walked back to the main desk at approximately 2:45 pm.   (*Id.*)   When he looked at the surveillance camera monitor, Hasenberg saw Bliven "standing in a […] weird manner, just standing straight up."   (*Id.*)   When he enlarged the image on the screen, Hasenberg realized "what [he] was looking at."   (*Id.*)   Hasenberg made other officers aware of the situation, entered the cell, and commenced life-saving measures.   (*Id.*)

There remains no genuine issue of material fact as to the subjective prong of Plaintiff's Eighth Amendment claim against Hasenberg.   The record shows that Hasenberg worked as a deputy with the department whose duties included road patrols.   Hasenberg did not work as a corrections officer who was required to completed hourly rounds at the jail or within the first 30 minutes of his shift. Hasenberg did not have significant interaction with Bliven during his time at the jail. There is no evidence that Hasenberg knew or believed that Bliven was suicidal. Hasenberg entered the jail, observed Bliven on the monitors, and acted promptly to

34

administer medical aid.    Plaintiff's deliberate indifference claim against Hasenberg fails to meet the Rule 56 standard.

### 6. Defendant Rantala

Plaintiff sued Sheriff Rantala in his personal and official capacities.    (ECF No. 1, PageID.5.)    Plaintiff alleged that Rantala acted with deliberate indifference by (1) failing to supervise staff at the Ontonagon County Jail and (2) failing to develop monitoring policies sufficient to prevent suicide.    (*Id.*)

In cases such as this, where the defendant is both supervisor and policymaker, individual-capacity claims "may appear indistinguishable" from official-capacity claims, which actually lie against the municipality.    *Essex v. Cty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013).    Public officials are liable in their individual capacities only if they "know[ ] of and disregard[ ] an excessive risk to inmate health or safety."    *Farmer*, 511 U.S. at 837.    This means "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."    *Id.*    "[A]t a minimum, the plaintiff must show that the defendant at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."    *Id.* (internal quotation marks omitted).    A supervisory official's failure to supervise, control, or train an offending subordinate is not actionable without this minimum showing.    *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

At the time relevant to the events in the complaint, Rantala served as the Sheriff of Ontonagon County.    (ECF No. 55-7, PageID.287.)    As Sheriff, Rantala

monitors and approves the policies for the Sheriff's Department.  (*Id.*, PageID.288.) There were and are no suicide prevention policies in the Department.  (*Id.*) Rantala oversees all the members of his Department.  (*Id.*)

On May 26, 2021, Rantala was not in the building.  (ECF No. 55-9, PageID.340.)  There is no evidence in the record suggesting Rantala had any personal interaction with Bliven before his death.  Rantala made no personal decisions in Bliven's classification level, housing, or otherwise.  There is no evidence in the record showing that Rantala knew Bliven would commit self-harm or was suicidal.  There is no evidence showing that Rantala was aware or should have been aware that Bliven was in need of supervision beyond that described by the policies already in place.

Plaintiff's claim for deliberate indifference against Rantala fails to meet the Rule 56 standard.  As discussed above, Plaintiff has failed to show that the Defendants' actions violated Bliven's Eighth Amendment rights.  Where there has been no constitutional violation, Plaintiff cannot show that Rantala expressly or implicitly authorized, approved, or knowingly acquiesced to unconstitutional conduct by his subordinates.  Thus, supervisory liability cannot be imposed on Rantala.

### 7.  Conclusion as to Individual Defendants

Accordingly, the Plaintiff has failed to establish both the objective and subjective prongs required to establish a claim of deliberate indifference under the *Farmer* analysis.[5]  Although Bliven's death is, of course, tragic, Plaintiff has failed

---

[5]    The undersigned notes that even if the Court had employed the recklessness

to show that there existed a serious risk of suicide or that any of the Defendants knew, believed, or acted unreasonably in light of that serious risk.    The individual Defendants are therefore entitled to qualified immunity.

### C. Monell Liability – Ontonagon County

Plaintiff alleges that Defendant Ontonagon County was deliberately indifferent to Bliven's serious medical needs.    (ECF No. 1, PageID.10−13.)    Plaintiff asserts that the County (1) failed to implement sufficient classification and monitoring policies indicating a custom of indifference and (2) failed to adequately train employees.    (*Id.*)    In their motion for summary judgment, Defendants argue that (1) there can be no *Monell* liability where there is no constitutional violation, (2) the County has implemented adequate classification and monitoring policies, and (3) training of County employees was adequate.    (ECF No. 55, PageID.192−95.) Plaintiff argues in her response that Defendant County adopted a custom of indifference to illegal policies, practices, and procedures.    (ECF No. 59, PageiD.434.)

A municipality is not subject to § 1983 liability "for an injury inflicted solely by its employees or agents."    *Kovalchuk v. City of Decherd*, 95 F.4th 1035, 1038 (6th Cir. 2024) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).    Instead, the municipality can only be held liable "for [its] own illegal acts."    *Id.*    (alteration in original) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)).    Where a municipal

---

standard demanded by *Helphenstine*, the Defendants would still be entitled to qualified immunity.    60 F.4th 305.    Defendants did not act recklessly by adhering to Department protocol for minimum or medium risk detainees, as Bliven did not exhibit an objectively strong likelihood of committing suicide.

employees harms a private party, that party must show that the employee's unconstitutional conduct stems from a municipal "policy or custom." *Coleman v. Hamilton Cnty. Bd. of Cnty. Comm'rs*, 130 F.4th 593, 599 (6th Cir. 2025).

There are four recognized avenues for a plaintiff to establish a municipality's policy or custom: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). "Even after showing an unlawful policy or custom, a plaintiff must also demonstrate a direct causal link between the policy and the alleged constitutional violation in order to show that the municipality's deliberate conduct can be deemed the 'moving force' behind the violation." *Jones v. Louisville/Jefferson Cnty. Metro Gov't*, 482 F. Supp. 3d 584, 597 (W.D. Ky. 2020) (quoting *Spears*, 589 F.3d 249 at 256 (cleaned up)).

In *Watkins v. City of Battle Creek*, the Sixth Circuit held that if "no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." 273 F.3d 682, 687 (6th Cir. 2001). Generally, if no constitutional violation can be attributed to an individual municipal actor, it is unlikely that the plaintiff was deprived of a constitutional right at all. *See North*, 754 F. App'x at 390. More recently, the Sixth Circuit has recognized that "in certain unusual circumstances, a municipality might be liable for a constitutional

violation even in the absence of a liable individual." *Hart v. Hillsdale Cnty., Michigan*, 973 F.3d 627, 645 (6th Cir. 2020); *Winkler v. Madison Cnty.*, 893 F.3d 877, 900 (6th Cir. 2018).   A *Monell* claim against a municipality may proceed without a claim against an offending officer, so long as it remained consistent with a finding of a constitutional violation.   *Stucker v. Louisville Metro Gov't*, No. 23-5214, 2024 WL 2135407, at *6 (6th Cir. May 13, 2024).

As stated above, the individual Defendants in the case did not act with deliberate indifference to a serious medical need.   However, the undersigned shall evaluate whether the County is liable for a constitutional violation separately.

### 1.  Policy or Custom

Plaintiff alleges (1) the Defendant's classification policies were inadequate and (2) Defendant failed to institute appropriate monitoring policies demonstrating a custom of indifference.   (ECF No. 1, PageID.11−13.)   Defendants assert that their classification and monitoring policies were adequate to address the needs of non-suicidal detainees.   (ECF No. 55, PageID.193−94.)

A plaintiff asserting a section 1983 claim on the basis of a municipal custom or policy must "identify the policy, connect the policy to the [County] itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir.).   A municipality may be held liable for failure to institute a policy to avoid an alleged harm "where the need to act 'is so obvious, and the inadequacy so likely to result in the violate on of constitutional rights, that the policymakers of the [municipality] can reasonably be

39

said to have been deliberately indifferent to the need.'" *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

At the time relevant to the complaint, the Ontonagon County Jail had inmate classification policies in place. (ECF No. 55-14.) Policies were in place to "ensure the safety of the staff and inmates." (*Id.*, PageID.370.) Classifications were based on responses to screening questions asked at intake and an evaluation of an individual's prior record. (*Id.*, PageID.382–86.) Inmates could be classified as a minimum, medium, or maximum security risk and were assigned housing accordingly. (*Id.*, PageID.375, 384.) Classifications were to be reviewed between 30 and 90 days of the previous classification. (*Id.*, PageID.375–76.) Classification reviews could also be triggered by changes in mental health status or the discovery of new pertinent information. (*Id.*)

The classification system took into account the mental and physical conditions of inmates. If inmates appeared to be severely intoxicated, they would not be booked and would be sent to the hospital. (*Id.*, PageID.384.) Inmates displaying intoxication that was not deemed severe or who appeared suicidal were required to be placed in the detox cell. (*Id.*, PageID.385.) At the time of Bliven's intake, the detox cell was not available, but the capias cell was available. (ECF No. 55-6, PageID.246.) The capias cell was typically reserved for female inmates and thus an override was required to open that cell to male inmates. (*Id.*, PageID.249.)

Policy dictated that corrections officers complete checks on the inmates throughout their shifts.   Officers were to complete checks within the first and last 30 minutes of their shifts.   (ECF No. 55-14, PageID.372.)   Throughout their shifts, officers were to check on inmates at least once every 60 minutes at irregular intervals. (*Id.*)   At least 12 cell checks were to be completed in every 12 hour shift.   (*Id.*)

In the opinion of the undersigned, the Plaintiff has failed to create a genuine issue of material fact as to whether County lacked adequate policies for inmates who did not display a risk of suicide.   Plaintiff cites *Milby v. Underwood* to support her argument that the jail should have adopted classification policies and monitoring policies specifically related to individuals at risk for suicide.   713 F. Supp. 3d 383 (W.D. Ky. 2024)   However, the Sixth Circuit has repeatedly held that "there is no general constitutional right of detainees to receive suicide screenings or to be placed in suicide safe facilities, unless the detainee has somehow demonstrated a strong likelihood of committing suicide."   *Gray*, 399 F.3d at 616 (citing cases).

As discussed at length above, and in contrast to the decedent in *Milby*, Bliven did not show signs of suicidal ideation or a strong likelihood to commit suicide. While Bliven did exhibit signs of mental illness at booking, this did not indicate to Waldrop that he was suicidal.   What's more, nothing in the record suggests that Bliven exhibited a change in behavior that would have triggered a classification review related to potential suicide risk.   On the day of his death, Bliven was monitored.   Roberts performed hourly checks as he was required to for average risk inmates.   Indeed, Roberts performed a check at 1:25 pm and Clinesmith performed

41

a check on Bliven less than an hour laster at 2:09 pm.    Although another policy may have prevented Bliven's suicide, the Sixth Circuit has stated that pointing out hypothetical policies that may have prevented a decedent's suicide "does not establish 'a deliberate and discernable county policy'" sufficient to sustain liability.    *Linden v. Washtenaw Cnty.*, 167 F. App'x 410, 420 (6th Cir. 2006) (quoting *Crocker v. Cnty. of Macomb*, 285 F. Supp. 2d 971, 977 (E.D. Mich. 2003).

## 2. Training

Plaintiff alleges that Defendant County and Sheriff Rantala failed to adequately train and supervise corrections officers.    (ECF No. 1, PageID.12.)

Although Plaintiff styles her failure-to-train-or-supervise claim as one against the County and Rantala in his official capacity, such a claim "is treated as a suit against the municipality." *Doe v. Claiborne Cnty., Tenn. By & Through Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 509 (6th Cir. 1996).    Failure-to-train under *Monell* is broader than an individual-capacity claim; it "implicate[s] the conduct of a defendant supervisor insofar as he acted with deliberate indifference in his official capacity as a policymaker."    *Essex*, 518 F. App'x at 355 (citations omitted).    "To succeed on [an inadequate training] claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury."    *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 286-87 (6th Cir. 2020) (quoting *Ellis ex rel.*

42

*Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)); *see also City of Canton*, 489 U.S. at 388.

In the opinion of the undersigned, the Plaintiff has failed to create a genuine issue of material fact as her inadequate training claim.    Plaintiff argues that national data establishing suicide as the leading cause of death in custody put Ontonagon County on notice of issues regarding suicidal inmates in the Jail.    (ECF No. 59, PageID.433.)    However, as discussed above, there was no substantial likelihood of suicide in this case.    Even if the record did reflect a substantial risk of suicide, Plaintiff has failed to plead facts or provide evidence supporting her claim that the County failed to supervise or train employees.    Plaintiff has not provided County training policies for the record.    Plaintiff fails to identify what kind of training would be appropriate and should have been implemented.    Similarly, Plaintiff has not provided supervisory policies or identified how those policies are insufficient.    Plaintiff relies on the report of Dr. Peters, which states that Clinesmith failed in his supervisory role by repairing the detox door and by failing to tell Roberts to return to the security desk.    However, evidence in the record has shown that each of the individuals in the jail was expected to do a myriad of duties and that as supervisor, Clinesmith was expected to participate in maintenance work to some degree.

### 3. Conclusion

Plaintiff has failed to create a genuine issue of material fact as to her *Monell* claim against Ontonagon County.    Plaintiff has not shown that the County adopted

43

a custom, policy, or practice that violated Bliven's rights and Plaintiff has not shown that the County adopted a custom, policy, or practice that amounted to a failure to train.

### D. State Law Claims

Plaintiff alleges that in addition to violating Bliven's constitutional rights, Defendants' actions constituted negligence, gross negligence, and resulted in Bliven's wrongful death under Michigan state law.    (ECF No. 1, PageID.15−17.) Defendants argue that Plaintiff's state law claims fail as a matter of law because the County was engaged in the exercise or discharge of a government function.    (ECF No. 55, PageID.195.)

In determining whether to retain supplemental jurisdiction over state law claims, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).    Ordinarily, when a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims.    *Id.*    Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

As the Court is dismissing Plaintiff's federal claims, the balance of the relevant considerations would therefore weigh against the exercise of supplemental

jurisdiction.    As such, the undersigned respectfully declines to exercise supplemental jurisdiction over Plaintiff's state law claims.

## VI.  Conclusion

The Court hereby **grants** the Defendants' motion for summary judgment and shall dismiss the case.

Dated:     August 29, 2025                     /s/ *Maarten Vermaat*
                                               MAARTEN VERMAAT
                                               U.S. MAGISTRATE JUDGE